## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **PRECISION WEATHER SOLUTIONS INC.,** | |
| **Plaintiff,** | |
| **v.** | **C.A. No. 1:21-cv-00821-LO-IDD** |
| **FARMERS EDGE INC., and FARMERS EDGE (US), INC.** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

### FIRST AMENDED COMPLAINT

Plaintiff Precision Weather Solutions, Inc., ("PWS" or "Plaintiff"), by and through its undersigned counsel, hereby files the following First Amended Complaint ("Complaint") for trade secret misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA"); the Virginia Uniform Trade Secrets Act ("VUTSA"); fraud in the inducement; conversion; and unjust enrichment against Defendants Farmers Edge Inc. ("FE") and Farmers Edge (US), Inc. ("FEUS") (collectively, "Defendants") and alleges as follows:

### THE PARTIES

1.      PWS is a corporation formed under the laws of Canada with a place of business at 70 Arthur Street, Winnipeg, Manitoba R3B 1G7 Canada.

2.      FE is a corporation formed under the laws of Canada with a place of business at 25 Rothwell Road, Winnipeg, Manitoba R3P 2M5 Canada.

3.      FEUS, a wholly owned subsidiary of FE, is a corporation formed under the laws of Minnesota having an office at 3350-2901 South Loop Drive, Ames, Iowa 50010.

4.      Whenever, in this Complaint, reference is made to any actions of Defendants, such allegations shall mean that the directors, officers, employees or agent of said entity or entities did perform or authorize the alleged acts or actively engaged in the management, direction and control of such entity and were acting within the course and scope of their employment.

## JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over Defendants, who have been conducting and/or are presently conducting business in this District on a regular basis. This Court has specific jurisdiction over Defendants because Defendants possess the requisite "minimum contacts" with this forum, including but not limited to the sale and/or offer for sale of products and services used in agricultural businesses in furtherance of the acts giving rise to this litigation. VA Code § 8.01-328.1.

6.      This Court has specific jurisdiction over FE because FE has been conducting and continues to conduct business in this District on a regular basis, including by the sale and offer for sale of products and services in agricultural businesses that are directed to this District, where such sales and offers for sale of products and services are in furtherance of the acts giving rise to this litigation. Such acts include, but are not limited to, FE's partnership with CNH Industrial to bring the FarmCommand, a weather integrated and weather-related digital agriculture platform to various agricultural customers located in this District.

7.      This Court has specific jurisdiction over FEUS because FEUS has been conducting and continues to conduct business in this District on a regular basis, including by the sale and offer for sale of products and services in agricultural businesses that are directed to this District, where such sales and offers for sale of products and services are in furtherance of the acts giving rise to this litigation.  Such acts include, but are not limited to, FEUS' partnership with CNH Industrial

to bring the FarmCommand digital agriculture platform through their dealer network to various agricultural customers located in this District and throughout the United States.

8.      FE goes to market in this District with another of its weather-related products including through its crop insurance partner Hudson Insurance Group (Hudson).  February 24, 2021 Prospectus, pp. 13, 51.  Crop insurance is substantial in Virginia covering 1.2 million acres with $555.7 million through the Federal Crop Insurance Program plus $34.8 million for crop-hail insurance in liability protection. Virginia crops contribute nearly $4 Billion to the economy. VAgriculture Facts and Figures 2019-2020, Virginia Department of Agriculture and Consumer Services, *available at* https://www.vdacs.virginia.gov/pdf/agfacts.pdf (stating, "Production agriculture employs nearly 54,000 farmers and workers in Virginia and generates approximately $3.8 billion in total output"). FE launched its insurance product "InsurTech" platform on 23rd July 2019, which connects to the accused FarmCommand and includes such solutions as "Smart Claim" and "Smart Reporting". Farmers Edge July 23, 2019 release. FE's "Smart Claim "[o]verlays...existing digital agronomy solutions." Prospectus p. 22.

9.       In a joint release dated January 21, 2021, Hudson and Farmers Edge announce that the Hudson crop agents and growers will gain access to "Smart Claim:"

> This partnership goes far beyond automating acreage and production reporting. Agents and growers will also gain access to Smart Claim, a highly intelligent tool that layers field-centric weather and imagery data with artificial intelligence, to predict the possible strike of disaster across insured acres. The tool modernizes the claim life cycle for all stakeholders, from detection and submission to estimation and adjudication.

Farmers Edge is doing the same thing with crop insurance company ProAg.  See January 12, 2021 joint release. Insurance providers offering risk management products through the Federal Crop Insurance Program which is underwritten by the Government of the United States must be approved by the United States Department of Agriculture. They are then recognized as the

Approved Insurance Providers (AIPs) of which there are only thirteen AIPs throughout the United States, and two of the AIPs, Hudson and ProAg, are partners with Farmers Edge. (See FCIP Primer):

> "Agricultural risk management continues to evolve, and ProAg is at the forefront of these changes by providing new strategies and solutions to our agents and growers," says Kendall Jones, CEO at ProAg. "Farmers Edge gives us the tools we need now to work effectively, but also paves the way to a new insurance experience—one with faster processing times, fewer reporting errors, and deeper partnerships between growers and agents. Their platform creates a central source of trust; from advanced analytics and data collection to detailed field intelligence and data management, it provides a complete picture of current and forecasted conditions and outcomes. This new level of connectivity helps our agents better facilitate operations, stand out from the competition, and uphold the high-standard of customer service for which we're known."

Crop insurance agents for both Hudson and ProAg are serving Virginia.  Crop Insurance, FarmPLUS Insurance Services, *available at* farmersontheweb.com/crop-insurance:



10.     Crop insurance revenue for FE is an important stream of revenue according to a FE revenue ecosystem graphic presented in their marketing materials filed on SEDAR:



11.     According to this ecosystem, FE considers revenue from its insurance business to be indirect sales generating commissions on insurance policies and referral fees on SEDAR.

12.     FarmPlus has 9 agents who are licensed in all counties in Virginia, including those counties in this judicial district. United States Department of Agriculture, Risk Management Agency, Agent Locator *available at* https://www.rma.usda.gov/informationtools/agentlocator.

13.     This Court has subject matter jurisdiction over this action pursuant to:  28 U.S.C. § 1331, because Plaintiff alleges a claim under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836; and 28 U.S.C. § 1338(b), and has pendent jurisdiction over the state law claims.

14.     Venue is proper in this district under 28 U.S.C. § 1391, because a part of the acts and the injuries arising from the trade secret misappropriation, fraud in the inducement, conversion, and unjust enrichment complained of herein have occurred and are occurring in this judicial district.

15.     Venue is proper in this district as to FE under 28 U.S.C. § 1391, because a part of the acts and the injuries arising allegations complained of herein have occurred and are occurring in this judicial district.  Such acts include, but are not limited to, FE's partnership with CNH Industrial to bring the FarmCommand digital agriculture platform to various agricultural customers located in this District.

16.     Venue is proper in this district as to FEUS under 28 U.S.C. § 1391, because a part of the acts and the injuries arising allegations complained of herein have occurred and are occurring in this judicial district.  Such acts include, but are not limited to, FEUS' partnership with CNH Industrial to bring the FarmCommand digital agriculture platform to various agricultural customers located in this District.

## FACTUAL BACKGROUND

17.     PWS has specialized in precision meteorology and climatology for business since its inception in 2012.  PWS delivers proprietary solutions to a range of industries including agriculture, aviation, sports and entertainment, emergency response and preparedness, construction, and others.

18.     As a full-service meteorology company, PWS professionally deploys and maintains a variety of standardized stations and sensors for the observation of weather and soil systems, operating its own standardized network that generates high quality meteorological data ("PWS Network").  PWS developed its system ("PWS System"), which incorporates sophisticated

backend infrastructure designed to manage and ingest big data with billions of weather and soil data from the PWS Network and stations around the world. The PWS System drives PWS' proprietary integrated platform ("PWS Platform") through and by, including but not limited to, delivering meteorological and other data ("PWS Data") through Application Programming Interfaces (API). The PWS Platform encompasses proprietary software, applications, methods, models, algorithms and other intellectual property.

19.     The PWS Service incorporates the PWS Network, PWS System, PWS Data and PWS Platform, which all incorporate PWS' Trade Secrets, confidential and proprietary information and intellectual property.  The PWS Service including PWS' Trade Secrets, were developed based on substantial years of experience and expertise of its founder and employees in various technical areas. PWS' Trade Secrets include but are not limited to:

a)     Meteorology and earth sciences; meteorological and climatological stations and sensors, soil sensors, industry standards, network design, meteorological data, deployment and maintenance methods, protocols, and practices; more specifically, the Trade Secrets include the specific design and implementation of PWS' meteorological stations and sensors, as well as their deployment, maintenance, and data collection protocols;

b)     Information systems and systems architecture, software development, big data and data management, quality assurance and control data methods and procedures, APIs, algorithm formation and modeling, graphic user and user interface design and development, and application development; more specifically, the Trade Secrets include the architecture of the PWS Platform, the PWS Platform software, and PWS' aggregated data from the PWS Network; and,

c)     Application of meteorology and climatology to industries, particularly the agriculture sector, understanding of customer needs and requirements, creation of interpretation

tools driven by sophisticated science, commitment to research and development, and other expertise, more specifically, the Trade Secrets include the algorithms and parameters underlying PWS' crop growth and crop risk models of the PWS Platform.

20.     PWS licenses access to the PWS Platform on a subscription basis, or on a Platform as a Service ("PaaS") basis.  In order to access the PWS Platform, all users must agree to comply with the PWS Terms of Service ("ToS").  If the license also includes PWS' proprietary agronomy solutions, then the licensee must further agree to the PWS Agronomy ToS. For continued access to the PWS Platform, the licensee must further agree to any updates to the PWS ToS and the Agronomy ToS, wherever applicable.

21.     Shortly after its inception, PWS became a rapidly emerging high tech meteorology company, initially focused on serving the Great Plains agricultural industry. By 2014, application of the PWS Service was known by sophisticated farmers in the farming communities to increase profit and yield.

22.     In the spring of 2014, FE was an agronomy services company that was struggling to differentiate itself, and had limited ability to compete in the rapidly emerging and disruptive agriculture technology and precision agriculture boom. For example, FE had no internal capability, expertise or resources to develop competitive software solutions and would face inevitable failure. A former FE Hub Manager, who had the highest sales in the company at the time, Dale Steele, stated that FE had no in-house software development capabilities to develop the necessary technology for an "all-in-one" platform for the ag-tech industry. Mr. Steele further states that Mr. Barnes recognized the need to finance FE and sought venture capital from the firm, Kleiner Perkins, to build customer technology solutions. Despite the absence of this critical capability, FE CEO Wade Barnes had Mr. Steele show investor Kleiner Perkins the flagship facilities in

Lethbridge Alberta, tour Mr. Steele's clients with some of the largest farms in western Canada, and participate in a meeting in which Mr. Barnes promised the investor an "all-in-one" platform that incorporated the PWS Services.  Shortly thereafter, Mr. Steele approached Mr. Barnes to acquire GranDuke Geomatics to deliver the PWS Services that had been promised to Kleiner Perkins but understood from Mr. Barnes that he was not interested in acquiring the third-party firm at that time.

23.     Weather solutions were, and still are, key aspects to providing a platform for farmers. Weather represents 90% of the risk a farmer faces every crop year and accounts for 70% of the damage every crop cycle.  On-farm weather, crop models and agronomy solutions are the foundation of and paramount to the growing precision agriculture and ag-tech industries. The ability to provide a platform that addressed weather related issues were, and continue to be, essential for FE to survive in the agriculture sector. FE continues to promote the significance of on-farm weather data and crop models for its products, including, but not limited to, FarmCommand and InsurTech.

24.     PWS' capabilities are unique in the industry, as Mr. Barnes acknowledged in his announcement delivered by email to his employees in October 2014, when he stated: *"This [PWS Service]is a very high level premium service, there is nothing as we understand available like this on the market in Canada today."* Similarly, in March 2015, Chief Marketing Officer Marina Barnes, wife of CEO Wade Barnes, stated to Kevin Grant, who, until last year, was the Chief Technology Officer: *"PWS provides much more accurate data, because it uses a number of forecasting models.  It is MUCH BETTER and MORE ACCURATE than ClimatePro product from Climate Corp.*"

25.     FE needed the capabilities of the PWS Service to survive, and had previously promised those capabilities to its investors, including but not limited to Kleiner Perkins, as well as its own staff and customers.  Rather than appropriately and lawfully acquiring the PWS Services, FE senior management took measures to improperly take the PWS Service for FE's use in violation and multiple breaches of agreements executed by the parties beginning in spring of 2014.

26.     PWS entered into a series of agreements with FE, including a Confidentiality Agreement in March 2014, an Enhanced Meteorological Services Agreement (with Addendum) in July 2014, and a Subscription Services Agreement in April 2015 which is the subject to the Terms of Service Agreement that was signed by CEO Wade Barnes, and agreed to by FE personnel (collectively "Agreements").  These Agreements extend to and encompass the PWS Services, including but not limited to: the PWS System, PWS API, PWS Data, deployment methods, deployment of the meteorology network, and subscription licenses to the PWS Platform for meteorology agro-meteorology solutions.

27.     The Agreements contain numerous restrictive and prohibitive terms and conditions, confidentiality provisions, and prohibit. FE from reselling, sub-licensing, retransmitting, reproducing, copying or otherwise distributing or exhibiting PWS' Trade Secrets, confidential information and proprietary information, and intellectual property, including information related to the deployment of the network, PWS API, PWS Data and PWS' Platform.  The Agreements further prohibit FE from using PWS' Trade Secrets, confidential information and proprietary information, and intellectual property to create weather and weather-related products.  The Agreements between PWS and FE further obligated FE to protect and maintain the confidentiality and security of PWS' Trade Secrets, confidential and proprietary information and intellectual

property, including, but not limited to: technology, network, systems, data, trademark, copyright and proprietary materials.

28.     Pursuant to the Agreements that Mr. Barnes executed, the Agreements strictly prohibited FE from using "solutions and tools to create weather and weather-related products". FarmCommand and InsurTech are weather and weather-related products, as are the insurance products created and marketed by FE throughout the United States. Furthermore, FE expressly agreed not to "make any commercial use of the Subscription Service, including, but not limited to, the Application(s), in or with any product that you create or distribute, or copy the Subscription Service onto your, or any other person's, website". In addition, FE and Anita Wortzman through TDS Law, were among other terms and conditions, strictly prohibited from using "registered or unregistered trademarks, logos or trade names of PWS".

29.     Pursuant to the Confidentiality Agreement and the Subscription Services Agreement, FE expressly agreed to terms and conditions, including but not limited to, as quoted in part herein:

        a)      *"Confidential Information" means any data or information, tangible or intangible that is of value to the Disclosing Party and is not generally known in the industry or to competitors of the Disclosing Party. Confidential Information shall include: (i) tangible information, marked by the Disclosing Party with the word "Confidential" or otherwise identified by an appropriate stamp of legend indicating its confidential nature; (ii) Confidential Information disclosed orally or visually and identified by the Disclosing Party as confidential when disclosed, and confirmed by the Disclosing Party in a written notice within thirty (30) days following disclosure, which notice shall include markings similar to those outlined in (i) above; and (iii) all*

*other information that, notwithstanding the absence of markings or designations, would be understood by the parties, exercising reasonable business judgment, to be confidential.";*

b)      *"Nothing in this Agreement shall be construed as: (a) requiring a party to disclose to the other party, or to accept from the other party, any particular information; or (b) granting any rights, under any trade-mark, trade-name, patent, registered design, copyright, design right, intellectual property right, or any similar right belonging to either party; or (c) either party making any representation or warranty as to the accuracy or completeness of any Confidential Information disclosed pursuant to this Agreement and the Disclosing Party shall not be liable for any errors or omissions in the Confidential Information or for the utilization and results of the utilization of the Confidential Information.";*

c)      *"Each Receiving Party acknowledges that, in the event of a breach by it of any of the provisions of this Agreement, the Disclosing Party may not have an adequate remedy in monetary damages. Accordingly, the Disclosing Party shall, in addition to other available legal or equitable remedies, be entitled to seek an injunction against such breach or any threatened breach."; and,*

d)      *"Effect of Termination. Upon expiration or termination of this Agreement: All rights and remedies under this Agreement are cumulative. No termination of this Agreement shall affect any accrued rights or obligations of either Party as of the effective date of such termination, nor shall it affect any rights or obligations of either Party that are Intended by their nature to survive any such termination."*

30.      Pursuant to the Subscription Services Agreement, FE expressly agreed to terms and conditions, including but not limited to, as quoted in part herein:

a)      *"Precision Weather Solutions requires Farmers Edge to agree to the Terms of Service. The Terms of Service is available at www.precisionweathersolutions.com. Farmers Edge is considered a Subscribing Organization as outlined in the Terms of Service and is subject to all the terms and conditions of the Terms of Service associated with these services. All subscribers must agree to this Terms of Service in order to access all products and services associated with this Agreement. All Farmers Edge personnel employees, contractors, associates and subscribers must agree to the Terms of Service for all applicable services. Login information for any and all subscribers including usernames, passwords, and usage cannot be shared. In the event that there is any conflict in the provisions between the Terms of Service and this Agreement, the Terms of Service shall prevail."; and,*

b)      *"All intellectual property associated with the data, dashboard and agronomic models is the sole property of Precision Weather Solutions Inc., and subject to the Terms of Service as previously identified. Farmers Edge shall not resell, sub-license retransmit, reproduce, copy or otherwise distribute or exhibit all or any part of the Precision Weather Solutions subscription solutions, and is prohibited, without limitation, from using the Precision Weather Solutions subscription solutions and tools to create weather and weather-related products. Farmers Edge shall use commercially reasonable efforts to prevent any portion of the Precision Weather Solutions subscription solutions from being collected or extracted by means of computer systems, "robots", "spiders", "web crawlers" or other processes, devices, programs, algorithms or methodology. If Farmers Edge or Precision Weather Solutions becomes aware that any portion of the subscription solutions is being collected or extracted by any person by any means including but not limited to Farmers Edge personnel, employees, contractors, subscribers or other associates of Farmers Edge then Precision Weather Solutions reserves the right to*

*terminate or suspend access to the subscription solutions. Famers Edge shall promptly inform Precision Weather Solutions of such a breach."*

31.     Pursuant to the Terms of Service Agreement, FE expressly agreed to terms and conditions, including but not limited to, as quoted in part herein:

a)     *The rights granted under the Licence are subject to your compliance with the terms and conditions of this Agreement. In particular, you may not do any of the following without obtaining prior written permission from us: sublicense, reproduce, duplicate, copy, rent, lease, sell, resell, exploit, redistribute, modify, create derivative works from, reverse engineer, broadcast, distribute, disseminate, decompile, publish, transmit, translate, adapt or vary any of the Subscription Service Content (as defined below) of the Subscription Service, or any portion thereof, including but not limited to, the Application(s), in any form or by any means whatsoever, be they physical, electronic or otherwise, except as expressly permitted by this Agreement or by applicable copyright laws; remove any copyright, trademark or proprietary notices from any copies of the Subscription Service Content of the Subscription Service; create a database in electronic or structured manual form by systematically downloading and storing all or any of the Subscription Service Content of the Subscription Service.";*

b)     *"The Subscription Service and all Subscription Service Content (as defined below) is the proprietary property of PWS, its content suppliers or its licensors, as the case may be, and is protected by Canadian and international copyright, trademark and other applicable laws. For the purposes of this Agreement, " Subscription Service Content" includes any and all material; content; the Application(s); Subscriptions; information in text, graphical, video and audio forms; images; maps; reports; analyses; forecasts; articles; publications; data, including all data received from Users' weather stations; databases; charts; graphics; photographs;*

*illustrations; technology; code; ideas; inventions; concepts; know-how; techniques; interfaces; designs; music; sound; software; product names; company names; trademarks; logos and trade names contained in the Subscription Service or used by PWS in association with the Subscription Service (other than User Content), together with all intellectual property rights therein. Except for the rights you may have in the User Content (as defined below) posted, submitted or otherwise made available by you via the Subscription Service, you do not acquire ownership rights or any implied right to the Subscription Service or Subscription Service Content that you obtained, accessed, used or viewed via the Subscription Service.";*

      c)     *"Without limiting the generality of the foregoing, you may not make any commercial use of the Subscription Service, including, but not limited to, the Application(s), in or with any product that you create or distribute, or copy the Subscription Service onto your, or any other person's, website. Your use of the Subscription Service does not transfer to you any ownership or other rights in the Subscription Service. PWS retains all rights not expressly granted hereunder. You are responsible at all times for acting in compliance with applicable copyright laws. The License is subject to this Agreement and does not include use of any data mining, robots or similar data gathering or extraction methods. Any use of the Subscription Service, other than as specifically authorized under this agreement, without the prior written permission of PWS, is strictly prohibited and will automatically terminate the Licence. Such unauthorized use may also violate applicable laws, including without limitation copyright and trademark laws, and applicable regulations and statutes. The Licence is revocable by PWS at any time without notice and with or without cause.";*

      d)     *"PRECISION WEATHER SOLUTIONS, PRECISION WEATHER SOLUTIONS & Design, PRECISION WEATHER SOLUTIONS INC. and other trademarks, trade*

*names and logos appearing on or via the Subscription Service or the Site are registered or unregistered trademarks, logos or trade names of PWS. Other product and company trademarks, trade names and logos appearing on or via the Subscription Service or the Site may be registered or unregistered trade names, logos or trademarks of their respective owners. Any use of the trademarks, trade names and logos (collectively, the "Marks") displayed on or via the Subscription Service or the Site, except as expressly provided in this Agreement, is strictly · prohibited. Nothing appearing on or via the Subscription Service or the Site or elsewhere shall be construed as granting, by implication, estoppel, or otherwise, any license or right to use; display or copy, in any manner, any Mark displayed on or via the Subscription Service.";*

e) *"You will violate this Agreement if you do any of the following:…"*

i. *"Impersonate another person (including celebrities), indicate that you are a PWS employee or a representative of PWS, or attempt to mislead Users by indicating that you represent PWS or any of PWS's partners or affiliates."*

ii. *"Attempt to get a password, other User account information, or other private information from an account holder or any other User of the Subscription Service."*

iii. *"Post messages for any purpose other than personal communication, including without limitation advertising, promotional materials, chain letters, pyramid schemes, or make any commercial use of the Subscription Service."*

iv. *"Make false reports to PWS staff members." and*

v. *"Attempt to interfere with, hack into or decipher any transmissions to or from the servers running the Site."*

f) *"All provisions of this Agreement will survive termination, including without limitation, the disclaimers, limitations on liability, warranties, representations,*

*ownership, termination, interpretation, intellectual property provisions, your licenses to us and the indemnity provisions of this Agreement will survive the termination or expiry of this Agreement."*

32.    FE's acts, described below, violated the parties' Agreements. Beginning in spring of 2014, FE senior management began to systematically and methodically misappropriate PWS' technology including but not limited to PWS Trade Secrets, confidential and proprietary information and intellectual property, technical know-how and proprietary technology, in direct and intentional violation of the Agreements. However, FE's theft was not discovered until June 2019, only after FE was forced to produce company documents pursuant to a Canadian court order. FE company documents revealed the scheme was orchestrated by FE's senior management team and Board of Directors, which at that time included, but was not limited to, Wade Barnes, Anita Wortzman, Curtis Mackinnon and Kevin Grant.

33.    Upon gaining his PWS login credentials in January 2015 on a PWS trial basis to which the PWS ToS was agreed, Curtis Mackinnon then promptly improperly distributed the PWS login information to his employees, in violation of the Agreements. Mr. Mackinnon instructed them to review the PWS Platform and create a roadmap to build a Farmers Edge platform, FarmCommand: *"Provide any additional thoughts you have to Matthew and he'll keep track of what we feel it should do so that when we build, we'll have a fairly clear path."*

34.    Once FE obtained the PWS login credentials to the PWS Platform, FE senior management improperly provided unrestricted and unauthorized access to all of its employees in order to wrongly acquire PWS' Services.  The PWS login credentials were assigned to specific named users, but particular senior management, including co-founders Curtis Mackinnon and Wade Barnes, freely instructed employees to distribute their PWS login credentials to others, in

violation of the Agreements including the ToS Agreement.  Moreover, FE senior management knew that the sharing of PWS login credentials was prohibited, as FE employees had read the ToS Agreement and advised senior management, including but not limited to Curtis Mackinnon, that the sharing of PWS login credentials was in direct violation of the Agreements.

35.     Full unauthorized access to the PWS Platform using PWS login credentials facilitated access to the most sensitive Trade Secrets, confidential and proprietary information and intellectual property, as well as the business of PWS.  The PWS login credentials were widely distributed to FE employees, and Curtis Mackinnon instructed his employees to create a roadmap for building their own platform, with which they complied and compiled a list of features and functionality.

36.     In early February 2015, Trevor Armitage, COO and high school friend of Mr. Barnes wrote an email to an employee of Anita Wortzman's at Acumen Corporate Development, where he described FE's plans to acquire the PWS technology: *"The Company has partnered with PWS to build up the weather program, a project that has gained interest at both the farmer and industry levels. This partnership will enable Farmers Edge to launch 500 weather stations by spring of 2015, and provide access to precision forecasting and cropping models, and a weather web-based platform. The goal is to train Farmers Edge technicians on the deployment and installation of stations, and then develop and move this system in house."*

37.     At that time, Acumen Corporate Development was actively raising venture capital for FE on the basis of what services FE would provide, including PWS Services. Anita Wortzman was, at that time, the President of Acumen Corporate Development, a partner at TDS Law, acted as an attorney for Farmers Edge, was the Corporate Secretary, was a shareholder of FE beginning

in 2005, and is now the President of FE.  TDS Law was also acting as corporate and trademark counsel for PWS, and the founder of PWS was a long-time client of TDS Law.

38.     Unbeknownst to PWS, under the direction of Anita Wortzman through TDS Law in direct violation of the Agreements, FE filed a series of trademark applications with the word "Precision" including but not limited to "Precision Solutions" in Canada with the Canada Intellectual Property Office (CIPO) and the United States Patent and Trademark Office (USPTO). TDS Law had been acting as PWS' trademark counsel, but then forced PWS to leave TDS Law and find another law firm while TDS Law filed trademark applications for FE that interfered and conflicted with PWS' trademark application. This conduct resulted in PWS suffering harm.

39.     In further direct violation of the Agreements, FE used the name "Precision Weather Solutions" and "Precision Weather Solution" in marketing materials, passing itself off as PWS, and marketing PWS as a product of or solution of FE. The conduct of FE caused confusion in the marketplace.

40.     Mr. Barnes falsely announced by email to his staff in October 2014, that he had signed a deal with PWS that described the PWS Platform. The Subscription Services Agreement, which addressed subscription licenses to the PWS Platform and states it is effective in February 2015, however, was not executed by Mr. Barnes until April 7, 2015. At that point in time, specific FE directors, officers and employees were licensed, and several then agreed to PWS' ToS, thereby granting them access to the PWS Platform subject to the ToS.

41.     Just seventeen (17) days after Mr. Barnes executed the Subscription Services Agreement with PWS on 7th April 2015, the FE senior management including but not limited to Patrick Crampton, Wade Barnes, Marina Barnes, and Trevor Armitage discussed by email a proposed press release of their intentions to go to their "own viewer".  COO Trevor Armitage

stated: *"My only comment is that PWS at this point believes that they have a long term relationship with us.  We cannot have it get out to them that we will be going to our own viewer.  This well severely impact the plan for the month of may."*

42.     FE Chief Marketing Officer Marina Barnes responded: *"Agree, we have to be very careful with this. Let's focus on PAM and FarmCommand in this document and leave PWS out of it for now."*  Ms. Barnes proceeded to draft two announcements, one that excluded PWS entirely that was distributed throughout FE and another separate announcement describing the upgrade to premium-level subscriptions on the PWS Platform.

43.     Patrick Crampton, who had recently joined FE as the Chief Product Officer, replied: *"Agreed, thanks for flagging the sensitivity. OK, agreed. My though was to make this into more than a FC vs PAM but not worth it based on the risk of a fallout with PWS right now."*

44.     Relatedly, on the same day, Mr. Barnes responded in a separate email to a dissatisfied FE employee: *"A Farmers Edge proprietary solutions growth stage, disease and weather app are not built as of yet. Dan Heany and his team will be working to develop these tools. A Farmers Edge weather app connected to our PAM solution is also being developed and will be launched this fall but for now we will be suing* [sic] *PWS solutions until then. Who told you these solutions were not built yet? I need to know so I can provide them the correct information."*

45.     Unauthorized access to the PWS Platform was also provided to Chief Product Officer, Patrick Crampton and CMO Marina Barnes through Curtis Mackinnon.  Other senior FE employees were likewise granted unauthorized access to the PWS Platform.  In a May 2015 email, entitled "getting ready for Russia," Mr. Barnes informed Sergey Sherstyuk and Chacko Jacob: *"...get the access to weather information. This is the access that Curtis has, we want to show case*

*all the weather stations data [and] insure we are comfortable with the new [PWS] crop models…*"
Sergey Sherstyuk replied: "*Hello Wade, I have access to PWS, Curtis sent me it.*"

46.     Unauthorized access extended beyond FE employees. Dan Heaney, Director of
Agronomy, emailed former FE CTO, Curtis Mackinnon: "*I want to give Andy Nadler an agromet
specialist we have on contract access to the PWS dashboard, Can we use your account for that.
He will take a look at the PWS system and start to put together a plan to transition to an inhouse
system.*"

47.     FE systematically used the PWS Platform to develop FE's platform,
FarmCommand and subsequently, more recently, InsurTech. The newly acquired FE software
team through GranDuke Geomatics, used and re-engineered PWS' technology to build its
FarmCommand platform, including the PWS System. FE employees knew that customers wanted
in a weather-related and agronomic integrated platform, and FE employees had promoted and
promised prospective customers in 2014 and throughout 2015 that they would have such a
platform.

48.     In January 2015, FE announced that it acquired GranDuke Geomatics, a company
owned by Kevin Grant and Guy Duke. FE instructed GranDuke Geomatics to build the platform,
FarmCommand, using the unauthorized and improper access to the PWS Platform. Shortly
thereafter, Kevin Grant then became FE's Chief Technology Officer and Board Director from co-
founder and Director, Curtis Mackinnon.   On 25th April 2015, Kevin Grant contacted Curtis
Mackinnon, just a day after Trevor Armitage remarked on the "long-term relationship with PWS,"
and asked: "*Any chance I could get a login to PWS? That way, I can at least see what data is
available, and build our interface accordingly.*"   Curtis Mackinnon then instructed his employee
to provide unauthorized access to Kevin Grant. After obtaining access, Kevin Grant further

requested: *"As soon as you guys have access to the premium site, please let me know, as we'll want to incorporate that data into our dashboards as well.".*

49.     While misrepresenting the relationship to PWS and forthcoming payments on outstanding invoices, FE senior management and Board Directors also misrepresented the nature and terms of the Agreements to investors, as well as their staff and customers. The misrepresentations included false statements to FE employees and customers that PWS had certain contractual obligations, misstated the number of stations to be deployed, identified the wrong deadlines for deployments, misrepresented the terms and conditions of the subscription licenses, refused to pay for employees to have their own subscription license, made false company-wide announcements with respect to the Agreements, and sought to mislead and hide information from PWS. These misrepresentations tarnished PWS' brand and reputation with FE employees and customers in the marketplace.  FE senior management undertook a systematic effort to pass off the PWS Platform as a system or product of FE; and at the same time demanded the critical system trade secret Application Programming Interface ("API") of meteorological data (including the trade secrets contained in that API) from the network from PWS in order to operate its misappropriated system.

50.     At least as of June 2015, FE had a goal to recreate PWS' Solutions including crop and risk models on a new FE Platform.  Ron Osborne stated in his initial strategy on 22nd June 2015: "Goal to provide a minimum of the existing PWS offerings, including the nine currently-offered models on a new FE platform".  By November 2015, FE used PWS' growth stage thresholds for a template of a growth model and was pursuing risk models for integration into FarmCommand.

51.     For approximately eleven (11) months, unauthorized FE employees and contractors had unrestricted access to PWS' Services including but not limited to the PWS Platform.  FE took and used numerous screen shots of the PWS Platform to create copies for their platform, and used the unauthorized access to the PWS Services in the development of FE's all-in-one platform. For approximately sixteen (16) months, FE also had access to PWS' methodology in setting up and deploying real-time stations and sensors, logistics, meta data and meta data collection and other critical operations. Once FE re-engineered PWS' Services including PWS' proprietary and confidential technology, FE applied the methodology and processes to other types of data, models, and applications.

52.     By late 2015, FE owed PWS in excess of $1.2 million in long outstanding invoices and contract terms, which has since increased based on contractual interest, in accordance with the Agreements.  FE senior management seemed to have intentionally misled PWS about the status of payment as part of their apparent scheme to gain continued access to PWS' Trade Secrets, confidential and proprietary information and intellectual property, and to force PWS to continue to deploy the meteorology network. FE also sought to ensure its customers had continued access to the PWS Platform through harvest of 2015.  FE gained access to the PWS Services through false pretenses including (i) feigning to seek a long-term business relationship with PWS, and (ii) falsely claiming FE would maintain strict confidentiality of PWS' proprietary information that was provided to FE personnel.

53.     FE filed litigation in Canada despite multiple breaches of the Agreements, which demanded the PWS API of PWS Data including historical data in order to operate "their own viewer".  In that litigation, FE agreed to a consent order whereby PWS would receive payments toward the PWS Network costs, joint communications with suppliers, and other terms, and in

exchange PWS would provide FE access to the PWS API. The Agreements were and still are in effect. The consent order did not give FE ownership of the PWS API or PWS Data including historical data, or unrestricted usage rights or any rights related to PWS' Trade Secrets, confidential and proprietary information and intellectual property. Subsequently, the court granted the constructive or resulting trust as security for PWS' Trade Secrets, confidential and proprietary information and intellectual property.  FE did not perform or comply under the consent order. As a result of the consent order, FE obtained the PWS API, which enabled FE to finish perfecting its copy of the PWS System and PWS Platform, and enter into direct competition with PWS in violation of the Agreements.

54.     FE's FarmCommand system is marketed throughout the United States through a series of multi-year partnerships with agriculture companies, OEMs, and agribusinesses such as Case New Holland Industrial (CNHI), Lindsay, Radicle, and other companies, including an agronomy consulting company that has committed to adding 650,000 acres with their customers.

55.     PWS' business model relied and relies upon sophisticated weather and soil stations, high-quality observation data, worldwide data collection and analysis, complemented by PWS' complex, proprietary Platform. PWS did and continues to charge customers at fair market value for stations and/or subscription licenses. Once FE misappropriated PWS' Services, FE aggressively entered the market, offering its new services in direct competition to PWS at little to no cost. FE misrepresented the nature of the relationship with PWS as a product of FE or exclusive partner of FE such that other agri-businesses in the sector did not want to engage with PWS, therefore cutting off PWS' access to farm customers and large enterprise.

56.     FE failed to acquire the PWS technology through legal means. Instead, FE Board Directors and senior officers orchestrated the theft of PWS' Trade Secrets, confidential and

proprietary information and intellectual property; intentionally failed to pay PWS for products and services rendered, misrepresented the nature of the relationship between the parties, while raising in excess of $425 Million in capital investments, generated sales, and partnerships to fund the misappropriation. FE then and now offers these competing services at little to no cost in the agriculture market.

57.     Moreover, FE continues to offer weather stations, data and FarmCommand at little to no cost in continued unfair competition. Even after a farm customer has cancelled their service arrangement with FE, the company extends the offer to farmers to utilize the weather stations at no cost, and leaves weather stations on the farm property long after any agreement with the farmer. The weather stations are the key flagship and only visible indication of on-farm services from FE. During presentations to farmers, business partners and investors, FE continues to promote the weather station network, weather data, crop models and more of the misappropriated PWS Trade Secrets, confidential and proprietary information and intellectual property.

58.     FE has continued to capitalize on the PWS Trade Secrets, confidential and proprietary information, intellectual property including meteorology expertise, and technical know-how, in further violation of the Agreements, by building a secondary and inter-related platform, InsurTech. FE announced the InsurTech platform and brand as of July 23, 2019.  In the announcement and various FE publications including their final prospectus, annual information form and other materials; FE indicates that the underlying data including but not limited to: weather data, crop model data and other information generated with FarmCommand, is directly used and applied to and through InsurTech along with Smart Claim and Smart Reporting solutions.

59.     The PWS Trade Secrets, confidential and proprietary information and intellectual property have been and continue to be misappropriated in FarmCommand, throughout InsurTech,

and FE's insurance products and solutions, which are also marketed in and throughout the United States. In their announcement, FE claims there are 291 million acres with crop insurance in the United States that the company is targeting across the United States. FE has also partnered with crop insurers, including by not limited to Munich Re, ProAg, and Hudson to market InsurTech in and throughout the United States.

**FIRST CAUSE OF ACTION**

**MISAPPROPRIATION OF TRADE SECRETS UNDER**
**DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et seq*.) ("DTSA")**

60.     PWS hereby incorporates Paragraphs 1 through 59, inclusive, as if set forth fully herein.

61.     PWS owns substantial Trade Secrets, as alleged above.

62.     PWS' Trade Secrets relates to products and services used, sold, and/or ordered in, or intended to be used, sold, and/or ordered in, interstate commerce including in this judicial district through CNHI and foreign commerce.  PWS' Trade Secrets include and relating to, including but not limited to: weather sciences, meteorology solutions, agronomy and crop modeling, data, API and the application of PWS' Trade Secrets to other applications. This information is not generally known and derives independent economic value from not being known.

63.     PWS, as stated above, has expended a significant amount of time and other resources in developing its Trade Secrets, confidential and proprietary information and intellectual property.  PWS goes to great lengths to protect the secrecy of this information by executing confidentiality agreements, maintaining technical mechanisms to ensure the security of PWS' confidential information, labeling information as confidential, and employing passwords and other

26

security mechanisms to protect PWS' confidential information, including computer access restrictions.

64.     PWS' Trade Secrets, proprietary and confidential information and intellectual property derive independent economic value from not being generally known and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the Trade Secrets, confidential and proprietary information and intellectual property.

65.     PWS' Trade Secrets, confidential and proprietary information and intellectual property are of great value to PWS, and have given Defendants, and would give any competitor, an unfair competitive advantage.

66.     PWS' Trade Secrets, improperly acquired, provide an unfair competitive advantage by: (1) not having to expend the time and resources to develop the Trade Secrets, confidential and proprietary information and intellectual property, as PWS has done; (2) enabling quick development of products and technologies to unfairly compete against PWS in order to diminish PWS' significant head start; (3) raising substantial investment capital to finance the improper acquisition and competition with PWS; and (4) other improper advantages.

67.     In violation of PWS' rights, Defendants willfully misappropriated PWS' Trade Secrets, confidential and proprietary information and intellectual property, and converted the same to its own use in its efforts to provide predictive modeling for crops and agronomy and to support insurance related efforts.

68.     By receiving, improperly using, and further disclosing the foregoing PWS Trade Secrets, Defendants have misappropriated PWS' Trade Secrets in violation of 18 U.S.C. § 1836, *et seq*.

69.     Defendants have acquired, used, and continue to use PWS' Trade Secrets, including valuable models, knowing them to be misappropriated and obtained through deceitful means, including fraud.  Such misappropriation permitted Defendants to develop products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such Trade Secrets, confidential and proprietary information and intellectual property.

70.     Defendants' misappropriation of PWS' Trade Secret information has been intentional, knowing, willful, malicious, and fraudulent.

71.     If Defendants' conduct is not remedied, they will continue to misappropriate, disclose, and use for their own benefit—and to PWS' detriment—the Trade Secret information, to the great detriment of the Trade Secrets themselves.

72.     Because PWS' remedy at law is inadequate, PWS seeks, in addition to damages, permanent injunctive relief to recover and protect the Trade Secrets and other legitimate business interests.

73.     As the direct and proximate result of Defendants' conduct, PWS has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

74.     PWS has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

75.     PWS' remedy at law is inadequate to redress the harm caused by Defendants' misappropriation and to ensure that further misappropriation does not occur.   Moreover, Defendants' intentional, willful, and malicious conduct mandates that the injunctive remedy will be inadequate to prevent Defendants' future misconduct.  Therefore, PWS further seeks an order

under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of PWS' Trade Secrets, confidential or proprietary information and intellectual property in the possession, custody, or control of any Defendants in order to recover and protect PWS' Trade Secrets and other legitimate business interests.

## SECOND CAUSE OF ACTION

### MISAPPROPRIATION OF TRADE SECRETS UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT, (VA. CODE §§ 59.1-336–59.1-343) ("VUTSA")

76.     PWS hereby incorporates Paragraph 1 through 75, inclusive, as if set forth fully herein.

77.     At all times relevant herein, PWS was in possession of the Trade Secrets as described above.  The Trade Secrets information constitutes PWS' trade secrets as defined by VUTSA.  This information has independent economic value and is not generally known, and derives independent economic value from not being known to the general public or to the relevant industry.

78.     PWS has expended a significant amount of time and other resources in developing its Trade Secrets.  In addition, PWS goes to great lengths to protect the secrecy of this information by executing confidentiality agreements, maintaining technical mechanisms to ensure the security of PWS' confidential information, labeling information as confidential, and employing passwords and several other security mechanisms to protect PWS' confidential information. Further, PWS has computer access restrictions.

79.     PWS shares its Trade Secrets, confidential and proprietary information and intellectual property only on a need-to-know basis with its employees and certain customers and partners subject to strict confidentiality agreements with an express obligation to protect

confidentiality. PWS requires any third party to sign a non-disclosure agreement ("NDA") prior to disclosing to that third party any confidential information.

80.     Defendants have unfairly and improperly obtained PWS' Trade Secrets through unauthorized access to PWS' platform and misuse of the data contained therein.

81.     By receiving, improperly using, and further disclosing the foregoing Trade Secrets, Defendants have misappropriated PWS' Trade Secrets in violation of the VUTSA.

82.     PWS is informed that Defendants knew that Trade Secrets were obtained from PWS' Platform.

83.     As a proximate result of Defendants' acts as alleged herein, PWS has suffered irreparable damages, and will continue to suffer irreparable damages, unless Defendants are enjoined from using the Trade Secrets, confidential and proprietary information, and intellectual property they misappropriated and are ordered to immediately return the Trade Secrets, confidential and proprietary information, and intellectual property.

84.     Defendants, in engaging in the aforementioned acts, are guilty of malice and oppression in that they deliberately intended to harm PWS' business and improve their own business by misappropriation, and acted in conscious disregard of PWS' rights.  Defendants' conduct therefore warrants the assessment of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

85.     PWS has no adequate remedy at law for its injuries to date, and Defendants will continue to wrongfully solicit PWS' existing and potential clients and customers, and utilize Trade Secrets, confidential and proprietary information, and intellectual property that was wrongfully misappropriated from PWS, including but not limited to Trade Secrets, confidential and proprietary information and intellectual property including technical know-how information that

is not generally available to the public at large.  PWS is entitled to a permanent injunction against Defendants as prayed for herein.

86.     PWS is informed and believes, and on that basis alleges, that Defendants' conduct was, and is, malicious, fraudulent, deliberate and willful.  PWS is therefore entitled to recover from Defendants exemplary damages in the amount of twice the total damages pursuant to the VUTSA.

87.     PWS is also entitled to an award of attorneys' fees pursuant to the VUTSA.

### THIRD CAUSE OF ACTION

### <u>FRAUD IN THE INDUCEMENT</u>

88.     PWS hereby incorporates Paragraph 1 through 87, inclusive, as if set forth fully herein.

89.     Defendants obtained contractual agreements from PWS under false pretenses, using material misrepresentations and material omissions to gain access to PWS trade secrets. The material misrepresentations and omissions were made by Board Director, co-Founder and CEO Wade Barnes, COO Trevor Armitage, co-founder and former CTO Curtis Mackinnon, CPO Patrick Crampton and others in senior management.

90.     PWS was misled by Defendants to believe that a long-term business relationship was formed. Defendants systematically and methodically misled PWS to believe the relationship was long-term by making consistent material misrepresentations and omissions.   The misrepresentations include engaging in negotiations for the Agreements in bad faith. The material omissions include but are not limited to the improper sharing of login credentials with unauthorized people, who participated in the trade secret theft. The material omissions also include misleading PWS about conducting business with PWS rather than taking the PWS technology.

91.     At all times relevant herein, senior management of Defendants knew what they were doing was wrong, including by having PWS issue login credentials to key personnel of Defendants so that they could access PWS' Trade Secrets to undertake their systematic misappropriation.

92.     As a result of the misrepresentations and material omissions made by Defendants, PWS was induced to enter into agreements with Defendants that provided Defendants with confidential access to the PWS Trade Secrets, so that Defendants could misappropriate the PWS Trade Secrets and profit thereby, to the detriment of PWS.

93.     PWS has suffered damage by the unauthorized taking and use of its property by Defendants.

94.     The conduct of Defendants was wanton, willful, and malicious with the intent to do harm to PWS, warranting an award of punitive damages.

95.     The contracts should be seen to be null and void, and all property, including money and equipment, should be returned.

**FOURTH CAUSE OF ACTION**

**<u>CONVERSION</u>**

96.     PWS hereby incorporates Paragraph 1 through 95, inclusive, as if set forth fully herein.

97.     At all times relevant herein, PWS exclusively owned and was in possession of certain valuable Trade Secrets, confidential and proprietary information, and intellectual property, as described above.

98.     Defendants' taking, possessing, deploying, and capitalizing on PWS' trade secrets are acts of dominion or control wrongfully exerted over PWS' Trade Secrets that have deprived

PWS of its rightful possession. Defendants willfully converted PWS' Trade Secrets, confidential and proprietary information and intellectual property to its own use and wrongfully exerted dominion and/or control over PWS' confidential and proprietary information and intellectual property as part of a scheme to steal PWS' confidential and proprietary information and intellectual property. At least a part of the scheme was to sell products directly to the public, and to take revenue and profits from the sale of products, while knowing that the confidential and proprietary information and intellectual property relating to the Products was the property of PWS.

99.    PWS is the rightful owner of this property. PWS is lawfully entitled to its possession, and has an absolute and unconditional right to the immediate possession and control of its Trade Secrets, confidential and proprietary information and intellectual property.

100.    Defendants have wrongfully and without authorization obtained and retained control, dominion, and/or ownership of PWS' Trade Secrets, confidential and proprietary information and intellectual property.

101.    The extent of control exerted by the defendants over PWS' property has reached the point of patenting the PWS technology in Farmers Edge's name. The involved patent and patent applications currently known are: . (1) US Patent 10, 983, 249 entitled "INDICATOR INTERPOLATION TO PREDICT A WEATHER STATE"; (2) Patent Application 20200342226 entitled "YIELD FORECASTING USING CROP SPECIFIC FEATURES AND GROWTH STAGES"; (3) Patent Application 20200342227 entitled "REFINED AVERAGE FOR ZONING METHOD AND SYSTEM; (4) Patent Application 20200337094 "TELEMATICS DEVICE FOR COMMUNICATING AND COLLECTING AGRICULTURAL DATA"; (5) Patent Application 20200250426 "HARVEST CONFIRMATION SYSTEM AND METHOD"; and (6) Patent Application 20200250427 "SHADOW AND CLOUD MASKING

FOR REMOTE SENSING IMAGES IN AGRICULTURAL APPLICATIONS USING A MULTILAYER PERCEPTION".   The technology described in these documents is at a minimum derived from improper access to PWS' trade secrets, but also includes out right copying.  This patent portfolio in the making belongs to PWS.  This patent portfolio resulted from FE's illegal access to PWS trade secrets, who converted the trade secrets into purported FE intellectual property precluded by the agreements.

102.    Defendants' possession and retention of PWS' Trade Secrets, confidential and proprietary information and intellectual property constitutes conversion and has harmed PWS.

103.    Defendants are, on information and belief, still in possession of PWS' valuable Trade Secrets, confidential and proprietary information and intellectual property, and are able to access and use this information.

104.    As the direct and proximate result of Defendants' conduct, including the theft of PWS' valuable Trade Secrets, confidential and proprietary information and intellectual property, PWS has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

105.    Punitive damages are proper to punish Defendants for its willful, intentional, and malicious conversion and to deter future tortious conduct.

**FIFTH CAUSE OF ACTION**

**<u>UNJUST ENRICHMENT</u>**

106.    PWS hereby incorporates Paragraph 1 through 105, inclusive, as if set forth fully herein.

107.    Defendants wrongfully received PWS' valuable Trade Secrets, confidential and proprietary information and intellectual property as described above, which they relied on to secure lucrative business contracts and obtain funding.

108.    PWS is informed and believes and, on that basis, alleges, that PWS' valuable Trade Secrets, confidential and proprietary information and intellectual property wrongfully obtained by Defendants was given to and shared amongst Defendants, and that Defendants understood that PWS' Trade Secrets, confidential and proprietary information and intellectual property were wrongfully obtained and shared.

109.    PWS is informed and believes and, on that basis, alleges, that Defendants used PWS' valuable Trade Secrets, confidential and proprietary information and intellectual property for their own financial benefit, including but not limited to developing a platform and competing directly with PWS for customers based on the stolen PWS Trade Secrets, confidential and proprietary information and intellectual property, and to obtain significant funding.

110.    Defendants were unjustly enriched by receiving investment funding to unjustly take the Trade Secrets, confidential and proprietary information and intellectual property from PWS, and wrongfully use it to develop their platform without providing any consideration or value in return to PWS. Defendants were further unjustly enriched by securing contracts and funding as a benefit for stealing PWS' Trade Secrets, confidential and proprietary information, and intellectual property.

111.    As a direct result of Defendants' wrongful conduct in stealing PWS' valuable Trade Secrets, confidential and proprietary information and intellectual property, Defendants were substantially and unjustly enriched by receiving customer contracts, partnership agreements and

venture capital funding from Kleiner Perkins, Fairfax Financial, Osmington, Mitsui, Avrios, Google, and others.

112.    It would be unconscionable to allow Defendants to retain the benefit of its customer and partner contracts and venture capital funding from the theft of PWS' Trade Secrets, given their wrongful conduct towards PWS that led them to secure customers and funding.

113.    PWS has no adequate remedy at law for the injuries currently being suffered in that Defendants will continue to wrongfully solicit PWS' existing and potential clients and customers and utilize information that was wrongfully misappropriated from PWS, including but not limited to Trade Secrets, confidential and proprietary information and intellectual property that is not generally available to the public at large.  PWS is entitled to equitable relief against Defendants under the fundamental principles of justice, as prayed herein.

## DEMAND FOR JURY TRIAL

114.    Plaintiff respectfully requests a jury trial in this action under Federal Rules of Civil Procedure 38 and 39 on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1.    Judgment in Plaintiff's favor and against Defendants on all causes of action alleged herein;

2.    A preliminary and/or permanent injunction restraining Defendants, and their agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from maintaining possession of, directly or indirectly disclosing, or further misappropriating or directly or indirectly using without authorization PWS' Trade Secrets and other confidential or proprietary information;

3.      An order requiring Defendants to certify, in writing, under oath, that they have returned and/or destroyed all confidential, proprietary, or PWS Trade Secret information and intellectual property, and that they no longer have any such information, or documents, photos, or any other material containing, reflecting or developed from such information, in their possession, custody, or control;

4.      Compensatory damages, according to proof, with interest thereon as provided by law;

5.      Consequential and actual damages, according to proof, or disgorgement of Defendants' profits unjustly obtained, with interest thereon as provided by law;

6.      Exemplary damages;

7.      Punitive damages;

8.      An order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of PWS' Trade Secrets and confidential or proprietary information and intellectual property, or information derived from such information, that is in the possession, custody, or control of Defendants, or that has been disclosed by Defendants, including in photographic, written, or any other form;

9.      An order under 18 U.S.C. § 1835 to preserve the confidentiality of all PWS Trade Secrets by Defendants;

10.     Pre- and post-judgment interest on all damages;

11.     Attorneys' fees;

12.     Costs of suit as provided for by law; and

13.     Such further and other relief as the Court deems just and proper.

Dated:  September 24, 2021          DENTONS US LLP

                                          By:   /s/ Mark L. Hogge
Mark Hogge (VSB No. 23946)
Tyler Goodwyn (VSB No. 37536)
Song Jung (*pro hac vice* pending)
Dentons US LLP
1900 K St., NW
Washington, DC 20006
(202) 496-7500
mark.hogge@dentons.com
tyler.goodwyn@dentons.com
song.jung@dentons.com

Donald E. Stout (VSB No. 12792)
Fitch Even, Tabin & Flannery LLP
1250 23rd Street, N.W.
Washington, D.C. 20037-1164
(202) 419-7000
dstout@fitcheven.com

*Attorneys for Plaintiff Precision Weather
Solutions*